## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 24 2020, 10:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jerry T. Drook
Marion, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Benjamin J. Shoptaw
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

William Robert McCarty,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

August 24, 2020

Court of Appeals Case No.
20A-CR-172

Appeal from the Grant Circuit Court

The Honorable Mark Spitzer, Judge

Trial Court Cause No.
27C01-1903-MR-5

**Pyle, Judge.**

# Statement of the Case

William McCarty ("McCarty") appeals his conviction, following a jury trial, for attempted murder.[1] McCarty argues that there was insufficient evidence to support his conviction. Concluding that there was sufficient evidence, we affirm his conviction.

We affirm.[2]

# Issue

Whether sufficient evidence supports McCarty's attempted murder conviction.

---

[1] IND. CODE §§ 35-42-1-1; 35-41-5-1. McCarty was also convicted of Level 5 felony reckless homicide, but he does not challenge that conviction.

[2] We note that our review of this case was impeded and delayed because the record on appeal did not include: (1) the Exhibit volumes that contained the more than 200 exhibits in this case; and (2) the transcription of the parties' closing arguments and final instructions, which are part of the proceedings before the trial court. Our appellate rules provide that the record on appeal "*shall* consist of the Clerk's Record and *all proceedings* before the trial court[.]" Ind. Appellate Rule 27 (emphases added). Additionally, our appellate rules clearly set out the corresponding duties of the trial court reporter and trial court clerk when preparing and submitting the Clerk's Record, transcript, and exhibits to our Court. Due to the above deficiencies in the preparation and submission of the record on appeal, we were required to send an order to the trial court clerk and trial court reporter to obtain the missing parts of the record. When the Exhibit volumes were submitted without pagination, our Court sent an additional order directing the court reporter and clerk to resubmit the Exhibit volumes in accordance with Appellate Rule 29 and Appendix A of the appellate rules. Upon receiving the resubmitted Exhibit volumes and a supplemental transcript containing the requested transcription of the trial, we were able to complete our appellate review. In hopes of avoiding unnecessary delays in future appeals, we remind trial court reporters and trial court clerks that the appellate rules setting out the duties of the trial court reporter and trial court clerk when preparing and submitting the Clerk's Record, transcript, and exhibits are not merely suggestions but are mandatory.

# Facts

In early March 2019, McCarty asked Michael Lawrence ("Lawrence") if he could borrow a gun. Lawrence let McCarty borrow a model twenty-three Glock forty-caliber semi-automatic handgun ("the Glock"). When Lawrence loaned the Glock to McCarty, the gun was loaded with two magazines, each holding twelve or thirteen bullets.

On March 7, 2019, McCarty and his girlfriend, Ariel Parker ("Parker"), were visiting with McCarty's friend, Christa Kelly ("Kelly"), at her trailer in a trailer lot in Grant County. Jonathan Lovell ("Lovell"), who lived in that same trailer lot, was also socializing with the group. During the evening, Lovell made a deal with McCarty and agreed that he would sell or trade his tennis shoes to McCarty. At the end of the evening, Lovell, however, changed his mind and told McCarty that he no longer wanted to "come off" or "sell" his shoes. (Tr. Vol. 2 at 44). When Lovell tried to leave Kelly's trailer, McCarty and Lovell "got into an argument over [Lovell] wanting to take [his] shoes back and kinda scuffled through out the door[,] and then [they] argued all the way down the street[.]" (Tr. Vol. 2 at 46). Lovell went home to his trailer, and McCarty "went on about his way." (Tr. Vol. 2 at 46).

The following day, Kelly contacted Lovell about the shoes. Kelly asked Lovell if he was "gonna still make the deal" and "come up off the shoes[,]" and he told her "no." (Tr. Vol. 2 at 46).

[6]     The next day, on March 9, just prior to 11:30 p.m., Kelly contacted Lovell multiple times by phone and text to tell him that he should have given his tennis shoes to McCarty. When Kelly called Lovell, she told him that "it was the wrong mistake" for him not to give the shoes to McCarty. (Tr. Vol. 2 at 47). After receiving Kelly's messages, Lovell went outside on his trailer porch to smoke a cigarette. Lovell's grandmother went on the porch to check on him. As Lovell's grandmother started to open the door to go back inside, Lovell saw McCarty drive up to Lovell's trailer. McCarty, who was driving his girlfriend's car, had the car's lights turned off. Kelly, who was a passenger in the car, "scream[ed] out the window [that] [Lovell] shoulda came up off the shoes[.]" (Tr. Vol. 2 at 48). McCarty told Kelly to lean back, and he then took the Glock, fired multiple shots at Lovell, and then drove away from the scene.

[7]     Lovell heard "three or four shots[,]" felt a burning sensation in his chest, arm, and leg, and "went into a shock." (Tr. Vol. 2 at 50). Lovell heard the glass on the door shatter and saw his grandmother, who had been behind him at the door, fall to the ground. A bullet hit Lovell's grandmother's face near her eye and exited out of the back of her head. Lovell's grandmother died of a result of the gunshot wound to her head. Lovell's thirteen-year-old brother called the police. Multiple officers from the Marion Police Department arrived on the scene. One of the officers saw that the bullet wound on Lovell's leg was "near" an "artery." (Tr. Vol. 1 at 49). The officer then put a tourniquet on Lovell's leg to help stop the bleeding before EMTs transported Lovell to the hospital.

[8] After McCarty and Kelly fled the scene, they went to Lawrence's house, where they "were acting real strange[.]" (Tr. Vol. 1 at 225). Upon McCarty's request, Lawrence picked up Parker and brought her back to Lawrence's house. When Lawrence and Parker returned, McCarty and Kelly were listening to a police scanner. McCarty told Lawrence that he had shot at some guy and that he knew he had hit him. McCarty also told Lawrence that he had used Lawrence's Glock and that he had the casings from the shots he had fired. McCarty gave Lawrence the Glock, which had one magazine in it. Additionally, McCarty told Parker that he had shot at Lovell and that he had been driving her car when he did it. McCarty and Kelly were "frantic" and "nervous" as they were "tryin' to figure out what to do with the car, what to do with the gun[,]" and "where to hide[.]" (Tr. Vol. 1 at 200, 229).

[9] The following day, McCarty called his cousin, Elicia Bockover ("Bockover"), and told Bockover that he had an emergency and that he needed a ride. After Bockover picked up McCarty and Kelly, McCarty told Bockover that he needed to get out of town. Bockover, who had seen on social media that two people had been shot at the trailer park, wondered if McCarty had been involved. Bockover urged McCarty to "please tell [her] he wasn't involved in what [she] had seen on the news[,]" and he responded, "I told that motherf*cker not to play with me." (Tr. Vol. 2 at 15, 16). When Bockover asked McCarty what had happened, "he said that he told Christa to sit back and he just pulled the trigger[.]" (Tr. Vol. 2 at 17-18). McCarty also told Bockover that he did not leave any evidence at the scene and that "all the shell casings came back into

the car." (Tr. Vol. 2 at 18). Additionally, McCarty told Bockover that "he let his anger get the best of him." (Tr. Vol. 2 at 18).

[10] During a police investigation, the police found two bullets at Lovell's trailer. Police also recovered the Glock from Lawrence. The Glock contained one magazine with six live rounds left in it.

[11] The State ultimately charged McCarty with murder, Level 1 felony attempted murder, and Level 5 felony battery by means of a deadly weapon.[3] In November 2019, the trial court held a four-day jury trial. The State's witnesses testified to the facts as set forth above. The final jury instructions included instructions for Level 5 felony reckless homicide as a lesser included offense to murder and Level 5 felony criminal recklessness as a lesser included offense to attempted murder. The jury found McCarty guilty of Level 5 felony reckless homicide as a lesser included of murder, Level 1 felony attempted murder, and Level 5 felony battery by means of a deadly weapon.

[12] During the sentencing hearing, the trial court vacated the battery conviction due to double jeopardy concerns. The trial court imposed a six (6) year sentence for McCarty's reckless homicide conviction and a forty (40) year sentence, with thirty-eight (38) years executed and two (2) years suspended to probation, for his attempted murder conviction. The trial court ordered the sentences to be

---

[3] The battery charge was for McCarty's act of shooting and striking Lovell. The State had also initially charged McCarty with Level 1 felony conspiracy to commit murder but dismissed that charge prior to trial.

served consecutively. McCarty now appeals only his attempted murder conviction.

# Decision

[13] McCarty argues that the evidence was insufficient to support his attempted murder conviction.

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences *supporting* the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007) (internal quotation marks and citations omitted) (emphasis in original).

[14] A person who "knowingly or intentionally kills another human being" commits murder, a felony. I.C. § 35-42-1-1(1). To prove that a defendant has attempted to commit a crime, the State must typically show that the defendant engaged in conduct that constitutes a substantial step toward the commission of the attempted crime, while acting with the same culpability required for that crime.

I.C. § 35-41-5-1. "A conviction for attempted murder requires proof of a specific intent to kill." *Henley v. State*, 881 N.E.2d 639, 652 (Ind. 2008). The "intent to kill may be inferred from the deliberate use of a deadly weapon in a manner likely to cause death or serious injury." Intent to kill may also be inferred from the "nature of the attack and circumstances surrounding the crime." *Corbin v. State*, 840 N.E.2d 424, 429 (Ind. Ct. App. 2006). Moreover, "firing a gun in the direction of an individual is substantial evidence from which a jury may infer intent to kill." *Henley*, 881 N.E.2d at 652.

[15] McCarty contends that the State failed to prove that he acted with the requisite specific intent to kill Lovell. Specifically, he asserts that "the State did not prove that firing of a handgun towards Lovell and hitting Lovell in the arm and leg with two bullets was proof beyond a reasonable doubt that McCarty acted with specific intent to kill Lovell." (McCarty's Br. 14). We disagree.

[16] Here, the State presented evidence that McCarty was angry at Lovell for declining to sell or trade his shoes to McCarty. McCarty drove up to Lovell's trailer with his car's lights turned off, pointed his Glock at Lovell, and fired the gun multiple times at Lovell, wounding him. Lovell was shot in his arm, leg, and chest. After McCarty fled the scene, he admitted to others that he had shot at Lovell and stated that he had "told that motherfucker [Lovell] not to play with [him]." (Tr. Vol. 2 at 15, 16).

[17] Here, both parties thoroughly argued the specific intent element during closing arguments. The jury, as finder of fact, determined that the State had met its

burden of proving beyond a reasonable doubt that McCarty had the specific intent to kill Lovell. McCarty's argument is simply a request to reweigh the evidence and reassess the jury's credibility determination, which we will not do. *See Drane*, 867 N.E.2d at 146. Accordingly, we affirm McCarty's attempted murder conviction. *See, e.g.*, *Perez v. State*, 872 N.E.2d 208, 214 (Ind. Ct. App. 2007) (affirming a defendant's attempted murder conviction), *trans. denied*.[4]

[18]    Affirmed.


Bradford, C.J., and Baker, Sr.J., concur.

---

[4] We also reject McCarty's suggestion that the evidence was insufficient based on inconsistent verdicts. He proposes that the jury's reckless homicide verdict for his killing of Lovell's grandmother would "call[] into question whether the State's proof of specific intent to kill when firing a gun at Lovell was sufficient for the jury to conclude McCarty was guilty of attempted murder in relation to Lovell." (McCarty's Br. 15). However, "[j]ury verdicts in criminal cases are not subject to appellate review on grounds that they are inconsistent, contradictory, or irreconcilable." *Beattie v. State*, 924 N.E.2d 643, 649 (Ind. 2010).